## Lare Estate

*J. Norman Davies* and *Jack W. Plowman*, for exceptant.

*Reed, Smith, Shaw & McClay, David M. Olds, Albert M. Wiggins, Jr., Richard B. Tucker, Jr.*, for accountants.

*Bresci R. P. Leonard, John A. Robb* and *Harbaugh Miller*, for claimants.

*Donald S. Little*, for Commonwealth.

BOYLE, P. J., February 6, 1967.—The bank was appointed administrator pendente lite* on January 6, 1944. The first and partial account of the bank was filed on December 2, 1949, and confirmed absolutely on January 14, 1952. Mr. Lare had filed exceptions

---

* See Lare Estate, 368 Pa. 570.

and objections to this account, but none of them raised any question concerning the bank's alleged duty to invest the accumulated income of the estate. No surcharge of the bank was then sought for noninvestment of the income. All questions which could have been raised by objections to the first and partial account of the bank are now res judicata as to all items involved therein: Crozer Estate, 346 Pa. 446, 449; Elkins's Estate, 325 Pa. 373; Stetson's Estate, 305 Pa, 62; Brown's Estate, 190 Pa. 464; Rhoads's Appeal, 39 Pa. 186. As appears in the findings of fact, supra, the first time that the question of possible liability of the bank, for failure to invest accumulated income, was raised, was on November 18, 1959, in the testimony in the audit of the second and partial account. This account and the exceptions and objections filed to it by Mr. Lare were withdrawn from the record by leave of court in April 1963. This was done apparently for the reason that the final settlement of the will contest, pending since 1942, was in view and it was actually settled on the record in the Court of Common Pleas of Allegheny County in January 1964.

During the bank's administration of the estate it has paid over to Mr. Lare the full one-half of the income to which he was entitled as surviving spouse of decedent. These payments to Mr. Lare, including those made to him since the settlement of the will contest, are in the total sum of $303,955.48.

The will contest teetered on the edge of compromise for over 20 years and was finally settled in January 1964. The bank, as administrator pendente lite, filed its second and final account on March 5, 1964. Mr. Lare, in propria persona, filed exceptions and objections to the account on April 6, 1964, raising the questions which are hereinabove set forth. At the settlement of the will contest in January 1964, Mr. Lare was represented by Harbaugh Miller, Esq. In the audit

of the bank's second and final account, Mr. Lare is now represented by Jack W. Plowman, Esq.

The questions raised by Mr. Lare's exceptions to the second and final account of the bank are set forth above and first to be discussed is:

1. Did the bank, as administrator pendente lite, have a duty to invest the income cash received by it during the period of administration from the date (January 14, 1952) of the final confirmation of its first and partial account to the date (December 10, 1965) of the audit of its final account, and should the bank be surcharged for nonperformance of this alleged duty?

The primary objective of an administrator with normal powers is to effect distribution to the testate or intestate heirs as promptly as possible. By the nature of his appointment, an administrator pendente lite cannot serve this primary objective. His duty is really that of a conservator or stakeholder, to hold safe the subject matter of litigation and to be prepared to turn the subject matter over to an administrator with general powers to effect distribution after the litigation affecting the subject matter has been terminated.

In its adjudication of the first and partial account in this estate, the Supreme Court of Pennsylvania made the status and power of the bank quite clear:

"While the Trust Company was so designated [as administrator d.b.n.] in its appointment, the designation should have been 'pendente lite,' such appointment being authorized by Section 4 of the Fiduciaries Act of 1917, P. L. 447, 20 P.S. ch. 3, app. 354. Such an administrator is virtually a custodian of the decedent's assets pending the will contest and endures only until the termination thereof. For powers and duties see Katz' Estate, 49 D. & C. 215 (1944)": Lare Estate, 368 Pa. 570, 572 (footnote).

Katz's Estate, supra, cited with approval by the Supreme Court in Lare Estate, supra, had this to say about the authority and obligations of an administrator pendente lite:

". . . In Ellmaker's Estate, 4 Watts 34 (1835), it was held that an administrator pendente lite is an officer of the court, whose duty is limited to filing an inventory, taking care of the assets, and collecting and paying debts. His authority does not extend to the payment of legacies or making distribution of the estate. Except where the contest is protracted, debts are not ordinarily paid or allowed at his accounting, the better practice being to confine his administration to gathering in and conserving the decedent's estate: Clemens' Estate, 21 Dist. R. 175 (1912) ; but distribution is never made: Loughran's Estate, 257 Pa. 534 (1917)".

The foregoing quotation well summarizes the principles applicable to the powers and duties of an administrator pendente lite formulated by the courts in Pennsylvania: Loughran's Estate, 257 Pa. 534; Commonwealth v. Mateer, 16 S. & R. 416; Gorsuch Estate (No. 1), 8 D. & C. 2d 190; Noble Estate, 71 D. & C. 183; Clemens's Estate, 21 Dist. R. 175.

As a stakeholder, it is clear an administrator pendente lite does not have the power or the obligation to invest income received. No case has ever suggested that such a stakeholder is required to speculate as to the probable time of termination of litigation which creates the necessity for the special administration, or the probable outcome thereof. The function of the administrator pendente lite is to so act as to assure the litigants that when they have stopped fighting, what they have been fighting about will be available, safe, intact and as it was before the litigation began, no more and no less. Any accrual to the principal received must obviously be safeguarded in the same way.

The rationale of this rule is sound. The parties to a lawsuit who hand the property involved to a stakeholder do not expect or want the stakeholder to exercise his independent discretion to change the subject matter of the dispute, nor do they want the estate to be withdrawn from immediate availability at the end of the dispute.

Consideration of alternatives to this rule demonstrate its necessity. If a stakeholder has a responsibility for investing the stakes he holds, then he must have the power to do so, and if he has the power or duty, he must exercise it. By so doing, he would obviously have the power to frustrate the objective of the litigation. In the matter before the court, the principal asset of the estate in 1944 when the administration began was a minority block of common stock in a closely held corporation, a nonliquid asset, an illegal initial investment for a fiduciary. If the bank, as fiduciary, had a responsibility and power as to investment, it would be constrained to promptly seek to convert this stock into acceptable fiduciary investments. There may have been legal investments available in 1944 which would have produced income of more than $418,743.38 over a 22-year period on an initial investment of $70,000, a return of over 20 percent per annum, but it does not seem likely.

Neither a testator nor the beneficiaries endow the administrator pendente lite with powers of investment and of conversion of estate assets, or with protection against the consequence of the exercise of such powers, and no case has been called to our attention which evidences that any court has held it had the power to do so.

Does the passage of time, as such, change the situation? It is argued here that at some unstated and unspecified point in time, the bank should have realized that there was going to be a long delay and that it

was not going to be called upon to deliver what it was holding, and should have undertaken an investment program. When was that point in time and by what standard was the bank to be governed in determining its obligations in this regard?

The contention that the passage of some years without settlement of the litigation required the judgment that the litigation would continue unresolved for a long period is invalid. It seems more logical to believe that the passage of a long period of time without settlement of a dispute indicates it will be settled in the near future rather than in the distant future. Any litigation, no matter how protracted, may be settled in an instant by agreement of the litigants. The administrator pendente lite, in this case, had no control over, association with, or part in the litigation. It cannot be contended that the bank did anything to delay its conclusion, rather it seems reasonable to observe that the exceptant to its account was the person primarily responsible for the incredible length of the litigation. The evidence in the record shows that the contestants were willing to consider reasonable settlement for years, but that Mr. Lare was not, even though he was unprepared or unwilling to go to trial. It is not suggested by what method the bank, as administrator pendente lite, could have judged when he would be ready to settle, or to try, the case. No one could foretell when the bank, as administrator pendente lite, would be called upon to perform *its* primary function of delivering the assets in its hands to an administrator for distribution.

The auditing judge holds that there is no legal authority in this Commonwealth which would sustain the imposition of a duty on an administrator pendente lite to invest the income received on the assets being held. The auditing judge also holds that the length of time the assets may be held cannot and should not

change the scope of the powers or the responsibility of an administrator pendente lite, as that length of time is totally beyond his control. Since the administrator pendente lite can neither shorten nor extend the duration of his appointment, he can neither accelerate nor postpone his obligation to deliver that which he holds and the attendant opportunity to be discharged from further responsibility. An ordinary administrator with general powers is not held liable for interest on estate assets in his hands until after the time when he should have distributed them. An administrator pendente lite should not be held to a different standard. If the parties to litigation choose to extend it for a protracted period, it is not the fault of the administrator pendente lite, nor should they be entitled to enforce upon such a stakeholder a greater burden than the law imposes on a normal administrator.

2. (a) Did the bank, as administrator pendente lite, commit a wrong by depositing estate cash in its own commercial department, rather than in some other accredited depository?

(b) Does the fact that the income cash, deposited in the bank's commercial department may or could have been used in the conduct of its business, impose a liability for surcharge upon the bank as administrator pendente lite?

Pittsburgh National Bank and its predecessor, Fidelity Trust Company, regularly deposited income received by them from the principal of this estate (principally dividends on the United Pocahontas Coal Company stock) in a demand deposit account in its own commercial department. The bank was an accredited depository under applicable law. It is charged by the exceptant that this was wrongful, "self-dealing", and a use of the funds of the estate for the

benefit of the fiduciary justifying imposition of a surcharge.

Unless there was an obligation to invest, the bank did only that which it should have done, it collected the dividend checks by depositing them in a commercial bank, which thereby acted as collection agent, and it created a debt in its favor with the commercial department of the bank as debtor to the trust department, a practice which is normally followed and is sanctioned by law.

There was no self-dealing involved in such a transaction. What was done with reference to the estate funds here involved was the same as was done and has been done with estate funds, generally, indeed what must be done with estate funds being held, put them in a bank. To hold that they were "used" by the bank for its own benefit is to confuse *the use by the bank as a fiduciary* with *the use by the bank as the debtor* of the trust department. The bank, as a fiduciary, made no improper use of the funds of this estate; it deposited them in a bank account. It does not make it wrong or self-dealing that the bank account was in the commercial department of the Pittsburgh National Bank, and before that the Fidelity Trust Company, and no rule of law exists which was violated by the action.

In the case of Stahl v. First Pennsylvania Banking and Trust Company, 411 Pa. 121, the Supreme Court clearly held that the exact practice here involved, the depositing of fiduciary funds by the trust department of a bank in the commercial department of the bank, was not a breach of fiduciary duty, created no rights in cestuis que trustent and, hence, did not create any funds subject to escheat. This was in practical effect, a suit by the beneficiaries against the trust company, because the Commonwealth stood in their shoes, and the court ruled that they had no interest in the bank's

earnings on the deposited funds. At pages 124-25, the Supreme Court, by Mr. Chief Justice Bell, held:

"It is a well recognized general rule that a trustee or fiduciary may not use trust property for his own benefit and if he does he is liable to a cestui que trust for profits made by him from the use of trust propperty. However, an exception to this general rule is recognized in the case of banks which under the decisional and statutory law of Pennsylvania are permitted to deposit trust funds as well as demand deposits in the commercial or savings department of their bank or in another bank, and while they may be liable for interest, they are not liable to the owner of such funds for profits made thereon by the bank: Moore's Estate (No. 3), 211 Pa. 348, 60 A. 991; Scott on Trusts, Vol. 2, Sec. 170.18, page 1249. See to the same effect, Dick's Estate, 183 Pa. 647, 39 A. 2; Reid v. Reid (No. 2), 237 Pa. 176, 85 A. 85; Jones Estate, 400 Pa. 545, 559, 162 A. 2d 408; Kaufmann's Estate, 137 Pa. Superior Ct. 88, 93-94, 8 A. 2d 472".

In the case at bar, the only act charged against the bank is putting the money in a checking account, as required of the fiduciary by law. There is no evidence or proof that the bank used the money for its own benefit, realizing profits for which it might be held accountable (to compensate the beneficiaries for the unauthorized risks to which their money had been submitted); it did not lose the money or consume it, it did not commingle the money impressed with fiduciary obligations with its own funds.

Jones Estate, 400 Pa. 545, is relied upon as imposing liability here. The case is not in point. There, the fiduciaries were testator's executors with power, statutory and testamentary, to invest, the court felt there was a primary fault of deliberate and wrongful delay in distribution, and there was the further fault of the conversion of productive principal assets, securities

and real estate, into nonproductive assets without justification. None of those facts exists here. Here, the administrator had no power to distribute the funds as to which complaint is made, it did not wrongfully delay distribution, and it did not convert productive principal assets into nonproductive funds. It received income cash and, in effect, held it as such. Unless there was an obligation to invest it, it committed no wrong by what it did with the income.

Carson Estate, 14 Fiduc. Rep. 420, cited by Mr. Lare in support of his objections, differs entirely on its facts from the case at bar. Carson involved an individual executor who was a major stockholder and controlling officer in the bank wherein the estate's money was deposited in a checking account. Income producing real estate was also sold by the executor to his bank and the proceeds composed a part of the noninterest bearing deposit. The essence of the decision of the auditing judge in Carson is that the surcharge was based upon self-dealing by the fiduciary for his own profit and failure to invest the proceeds of income producing real estate.

3. Is there a "duty to invest" income upon personal representatives generally which should be imposed upon the bank, as administrator pendente lite, under the circumstances of this case?

It is elementary that the function of a personal representative of a decedent is to collect, marshal and inventory the assets of the estate in accordance with law, pay the lawful debts of decedent and the estate, convert the assets into distributable form, file timely his account, and distribute the estate to the parties entitled upon the final confirmation of the account by the court. For any default in the performance of his duties which cause a loss to creditors or beneficiaries, the court will impose liability upon the per-

sonal representative and require him to compensate the injured parties from his own funds.

The decided cases make it clear that personal representatives have no duty or obligation to invest funds in their hands during the proper tenure of their administration and that the so-called "duty to invest" is descriptive of the rationale for imposing an obligation on a personal representative who has improperly delayed distribution or converted productive assets into nonproductive assets. The cases in which liability for interest has been imposed on personal representatives are those which involve an element of misconduct unrelated to any "duty to invest". In an early leading case (Hoopes v. Brinton, 8 Watts 73), the orphans' court had awarded interest to the legatees during the period that exceptions to the executors' account were pending before an auditor and then the court. The Supreme Court reversed the imposition of this interest, holding at page 74:

"The fund did not bear interest in the hands of the accountant during the pendency of the report in the Orphans' Court of exceptions, because it could not be paid over before final confirmation or consequently be said to have been vexatiously detained".

Other cases holding that interest may be charged against a personal representative who unreasonably delays distribution and is improperly detaining the shares of distributees, are: Biles's Appeal, 24 Pa. 335; Witman and Geisinger's Appeal, 28 Pa. 376; Lloyd's Estate, 82 Pa. 143; Wilson's Appeal, 8 Sadler 579; Walker's Appeal, 116 Pa. 419; St. Clair's Appeal, 2 Monaghan 264; Watson's Estate, 189 Pa. 150; Starr's Estate, 190 Pa. 162; Forry's Estate, 246 Pa. 448; Skeer's Estate, 253 Pa. 497. The principle of law which these cases etablish is that the personal representative is liable for interest in cases involving a wrongful detention of the distributive shares and

not for failure to perform a "duty to invest". As held in Wither's Appeal, 16 Pa. 151, 152-53, interest is not a "matter of right, a necessary consequence of money being in his [the fiduciary's] hands".

The decisions in the above-cited cases are all consistent with the ancient and simple rule set forth in the Act of March 29, 1832, P. L. 190, secs. 17 and 18, which provided as follows:

"17. No executors or administrator shall be liable to pay interest but for the surplusage of the estate remaining in his hands or power when his accounts are or *ought to be* settled and adjusted in the register's office: *Provided,* That nothing herein contained shall be construed to exempt an executor or administrator from liability to pay interest where he may have made use of the funds of the estate for his own purposes, previously to the time when his accounts are or ought to be settled as aforesaid.

"18. The amount of interest to be paid in all cases by executors, administrators and guardians, shall be determined by the Orphans' court, under all the circumstances of the case, but shall not in any instance exceed the legal rate of interest for the time being". (Italics supplied).

The Act of 1832 followed section 6 of the Act of March 27, 1713, 1 Sm. L. 81, but the proviso relating to self-dealing was new in the Act of 1832.

Sections 17 and 18 of the Act of 1832 were reenacted as sections 44(a) and 44(b) of the Fiduciaries Act of June 7, 1917, P. L. 447, 20 PS §§811, 812 (app.), with only minor changes in verbiage, and this is the act that controls in the present case. Section 44(a) provides as follows:

"No executor or administrator shall be liable to pay interest but for the surplusage of the estate remaining in his hands or power when his accounts are or ought to be filed: Provided, That nothing herein contained

shall be construed to exempt an executor or administrator from liability to pay interest, where he may have made use of the funds of the estate for his own purposes".

The present statute governing investment of funds of an estate by the personal representative is section 506 of the Fiduciaries Act of April 18, 1949, P. L. 512, as amended, 20 PS §320.506, which provides:

"Subject to his duty to liquidate the estate for prompt distribution and to the provisions of the will, if any, the personal representative may invest the funds of the estate but shall have no duty to do so. Any such investment, except as the court or the will may otherwise authorize or direct, shall be restricted to obligations of the United States or the United States Treasury, of the Commonwealth, or of any political subdivision of the Commonwealth".

Section 754 of the Fiduciaries Act of 1949, supra, also provides:

"A personal representative who has committed a breach of duty with respect to estate assets shall, in the discretion of the court, be liable for interest, not exceeding the legal rate on such assets".

A case relied upon by Mr. Lare, the exceptant, is Kohler Estate, 348 Pa. 55, 57, where the Supreme Court held:

"The duty of an executor generally is not to retain and invest, but to liquidate and terminate: Restatement, Trusts, section 6. If, however, a valid reason exists for the retention of a fund by the executor, it is incumbent upon him not to permit such fund to remain idle, but to invest it, and if there is a default in this regard he is chargeable with lawful interest thereon: Henry's Estate, 341 Pa. 439; Dick's Estate, 183 Pa. 647; Bruner's Appeal, 57 Pa. 46; Yundt's Appeal, 13 Pa. 575. See also Landis v. Scott, 32 Pa. 495".

In Kohler, the lower court dismissed exceptions filed by a life tenant and remaindermen to the account of the executrix. The exceptions alleged that losses had been occasioned to the estate by reason of certain investments, made by the executrix, of proceeds of sales of real estate belonging to decedent. The Supreme Court affirmed the decree of the lower court and the language quoted above was not in support of any surcharge of the executrix for anything. In this respect, the language is dictum. Apparently the court considered that the executrix, in making the challenged investments, acted under a power conferred impliedly upon her under the will of decedent. The administration estate was conducted as if it were a trust. In fact, the agency agreement involved in the case was made by the executrix with the corporate fiduciary whom testator had named as trustee for the objecting life tenant and the remaindermen who filed the exceptions. This case does not rule the case at bar. The cases cited in Kohler in support of a "duty" on an executor to invest are all cases which involved wrongful retention of estate funds which should have been distributed. This last statement should be qualified by pointing out that Henry's Estate, 341 Pa. 439, involved a guardianship of a minor's estate where a duty to invest was involved, so that the minors could be maintained and supported out of income, if possible. Further, in Henry, the court refused to surcharge the guardian for losses arising from investments of the estate's funds.

Before leaving Kohler, it should be noted that on page 58 the Supreme Court held:

". . . Suffice it to say that she [the executrix] relied upon advice of competent counsel in retaining the fund for investment purposes. 'Where a guardian or other fiduciary acts in good faith under advice of a competent lawyer, he is not liable for mistakes of law, if such

there be, or for errors of judgment': Dempster's Estate, 308 Pa. 153, 158. See also Riebel's Estate, 321 Pa. 145, 149; Henry's Estate, supra, 447; Kline's Estate, 280 Pa. 41, 44".

In the case at bar, the bank was advised by John D. McIntyre, Esq., a lawyer of the highest professional competence and standing, that, as administrator pendente lite it had no authority to invest the income in its possession. This appears in the official notes of testimony at page 42:

"CROSS-EXAMINATION BY MR. OLDS

"Q. Mr. McIntyre, what did you advise Mr. Duff with reference to the obligations and authority of the bank as administrator *pendente lite?*

"A. Well, I found a half dozen or so cases that said that the duty of an administrator *pendente lite* was to hold and conserve the assets, and not to pay any of them out; and that was the advice that I gave Mr. Duff.

"Q. Did you advise him with reference to the authority of the bank or its obligation to invest the fund received by way of income?

"A. My advice was that they did not have any authority, and that if they were going to attempt it we had better present a petition to Court and get the Court's permission".

Mr. Lare, the exceptant in the case at bar, in effect, is asking that he be awarded interest on interest. In the present case, approximately one half of the income received over all the years was distributed to Mr. Lare (Stipulation ¶7), usually pursuant to court orders, and the contested share was deposited in safe-keeping.

Relevant to the question of whether an administrator should capitalize the contested income cash are those cases that early rejected the notion of "rests" or compound interest in cases in which a personal representative was held liable for interest. See, e.g., Pennypacker's Appeal, 41 Pa. 494; Norris's Appeal,

71 Pa. 106. In the latter case, Judge (later Justice) Paxson said in an opinion adopted by the Supreme Court:

"I know of no instance in which any man has ever yet paid compound interest by the judgment of a court of this state": 71 Pa. at 123.

Yet, it is precisely the compounding of one half of the unusually large returns realized in this estate for which Mr. Lare is asking. Mr. Lare's claim entirely misconceives the function of the bank as a stakeholder. All the more is this so when it is recalled that, had this contested income been converted into some other form, settlement of the contest might have been further delayed by the constantly changing nature of the subject matter. Finally, it is clear that the bank could *not* have deposited these funds in a savings account in its commercial department as Mr. Lare has suggested. Section 41(a)1(11) of the Fiduciaries Act of 1917, 20 PS §801(11) (app.), limited such deposits to $1,000 and expressly prohibited making them in the institution which was fiduciary of the estate. The Fiduciaries Investment Act of May 26, 1949, P. L. 1828, sec. 12, as amended, 20 PS §821.12, increased the limit on the deposits, first to $1,500 when enacted, then to $5,000 in 1956, and finally to the amount insured ($10,000) by the FDIC. The prohibition against a fiduciary making time deposits in its own commercial department was not removed until 1963.

If the exceptant's position that the bank had the power and the duty to invest should be upheld, these would not have been limited to the income which accumulated for the benefit of the ultimate winners of the will contest. This power and duty would have extended to the principal of the estate primarily. Since there was at no time a testamentary authorization relating to investments, such a power would be limited by the applicable statutes to "legal" investments.

Under section 41(a) of the Act of 1917, common stocks were not authorized investments, and, because the United Pocahontas Coal Company common stock was not received "pursuant to the terms of the will" (section 41(a)1(17)(c)), the bank would not have been authorized to retain that stock. From this it follows that investment power in the bank would have given rise to a duty to dispose of the coal company stock and to reinvest in legal bonds or preferred stocks; such a change would have had an enormous, adverse impact on the parties to the will contest, particularly Mr. Lare, because no such legal investment would have generated the $358,248 in dividends collected by the bank on the coal company stock.

The auditing judge holds that, in the circumstances attending the case at bar, the bank, as administrator pendente lite, incurred no liability to the estate or to any beneficiary of it by not investing the *income* which accumulated in its hands.

4. (a) Did the bank, as administrator pendente lite, by reason of its noninvestment of the income cash of the estate, commit a wrong requiring that it be denied compensation for its services?

The exceptant alleges that the bank as administrator pendente lite has forfeited its right to compensation by its wrongful course of conduct in failing to perform its "duty" to invest the accumulated income of the estate or, in the alternative, by its (the bank's) misconduct in allegedly profiting by the lending of the estate's money to borrowers on the commercial side of the bank.

It should be noted that no exception is filed to the quantum of the executor's compensation charged. It is conceded that the compensation of the bank was earned but it is asserted that it has been forfeited because of the misconduct of the bank in keeping the cash of the estate on deposit in its own commercial

department and in failing to carry out its alleged "duty to invest."

Mr. Lare charges that the bank committed a wrong when it deposited funds of the estate in the commercial side of the bank, thus making them available to the bank for lending to its customers. For this alleged misconduct the exceptant contends that the bank should be obliged to forfeit its compensation as administrator pendente lite. The complaint is that the bank should have chosen another financial institution as depository. But, as pointed out in this opinion, supra, and as Mr. Lare has stipulated (Stipulation ¶9), the deposits made by the bank were in conformity with Federal and State law.

The bank's noninvestment of the accumulated income cash of the estate was not a violation of a legal duty. As the auditing judge holds in this opinion, supra, there was no violation of a duty by the bank in this aspect of the case which would oblige the court to impose a surcharge. It follows that the exceptant's contention, that there is a forfeiture of compensation for the same reason, is invalid.

(b) Have counsel for the bank, by representing the contestants in the will contest, committed a wrong which requires the court to deny them compensation for services rendered to the bank as administrator pendente lite?

Mr. Lare, the exceptant, contends that Reed, Smith, Shaw & McClay, as counsel for the bank and also for the contestants of the will of decedent, occupied a conflicting and unethical position, constituting a wrong, which obliges the court, in the context of this case, to forfeit their compensation. Again Mr. Lare does not challenge the quantum of the fee. He admits that the work was done, that the fee is not excessive but may not be paid because of the alleged dual, and therefore wrongful, position of counsel in representing the bank,

as administrator pendente lite, and at the same time, the contestants of the will.

The status of counsel for the bank and their right to be paid for their services has already been approved by the Supreme Court of Pennsylvania in Lare Estate, 368 Pa. 570, wherein Mr. Lare challenged the right of counsel to be paid for the same reason which he advances in the case at bar. In Lare Estate, supra, Mr. Lare stated in his brief, as one of the questions involved:

"2. Whether counsel were properly engaged where the administrator knew that counsel were at the time contesting the validity of a will probated by decedent's husband and where he protested the engagement of such counsel, the husband being interested in the estate in excess of one-half part thereof, or entirely, depending upon the outcome of the will contest. Negatived."

The court did not even deem the question worthy of discussion in its opinion and proceeded to review, and approve, the amount of the challenged fee. As a consequence of this decision, the propriety of the employment of Reed, Smith, Shaw & McClay has been judicially, and finally, determined.

5. Are the shares of the United Pocahontas Coal Company overvalued in the account (708 shares at $65 per share—a total of $46,020) so as to make the bank's commission excessive?

The gross estate involved in the administration to the date of filing of the account on March 5, 1964, is $427,312.14. Included in this are the 708 shares of stock in the United Pocahontas Coal Company valued, as inventoried, at $65 per share. At the audit hearing Mr. Lare testified that a fair value was $100 per share. The vice president in charge of research in the investment department of the bank testified that the value was $220 per share. The trust department of the bank valued the shares at $150 per share.

In any event the amount of compensation claimed by the bank in the amount of $16,000 is fair and reasonable in the circumstances and facts of this case. The bank's services in administering and conserving the assets of the estate extended over a period of 22 years. There were three accountings rendered, each one of them accompanied by litigation arising out of exceptions filed by Mr. Lare. The fiduciary services rendered were extraordinary in scope and character. There is no merit whatever in the exceptant's charge that the shares of the coal company were overvalued for the purpose of increasing its compensation.

From a consideration of the testimony and the evidence, the able briefs of counsel and his own study of the law as it applies to the facts in the case at bar the auditing judge enters the following

### Conclusions of Law

1. The bank, as administrator pendente lite, did not have a legal duty to invest the income cash of the estate.

2. The bank, as administrator pendente lite, acted in good faith upon the advice of able counsel in the matter of its alleged duty to invest the income cash of the estate and incurred no liability to the estate for the noninvestment of the funds.

3. The general rule of law is that the personal representative of a decedent does not have a duty to invest and the bank, as administrator pendente lite, in the circumstances in the case at bar did not have a duty to invest the cash income of the estate.

4. The bank, as administrator pendente lite, may not be surcharged for nonperformance of an alleged "duty to invest" the income cash of the estate.

5. The bank, as administrator pendente lite, did not commit a wrong by depositing the estate's income cash in a demand deposit account in its own commercial department.

6. The deposit of the estate's income cash in its commercial department imposed no liability for surcharge upon the bank as administrator pendente lite.

7. In making the deposits of the estate's income cash in its commercial department the bank complied with all the requirements of State and Federal law governing national banks having a trust department and a commercial department.

8. There being no evidence in the record in the case at bar that any of the income cash of the estate was used by the bank in its commercial department to make a profit for the bank, there is no legal merit in the exceptant's allegation that the bank was guilty of selfdealing and used the estate's money to make a profit for its own account.

9. As administrator pendente lite, the bank was a stakeholder and as such was liable to be called upon at any time during the administration to make distribution to the parties entitled, depending upon the final outcome of the lis pendens by trial or settlement.

10. The bank, as administrator pendente lite, although liable to a demand to turn over the assets upon short notice, had no control over the determination of the time when such a demand might be made or the time when distribution would be required of it.

11. The bank, as administrator pendente lite, held the income cash of the estate in its commercial department as funds *awaiting distribution* as that term is used in section 4 of the Banking Code of May 15, 1933, P. L. 624, as amended.*

12. The bank, as administrator pendente lite, did not wrongfully delay the distribution of the estate, did not wrongfully detain any part of the estate from any lawful distributee thereof, nor was the bank guilty of any act of fiduciary misconduct rendering it liable to damages on any account.

---

* See Jones Estate, 400 Pa. 545.

13. There are no circumstances in the case at bar which would make it an exception to the general rule of law that a personal representative of a decedent is not required to invest the income cash of the estate.

14. The beneficiary of this estate is not entitled to receive interest on interest or interest on income.

15. The bank committed no wrong which would cause a forfeiture of its compensation for its services as administrator pendente lite, and its compensation will be allowed as claimed.

16. The claim of counsel for the bank, as administrator pendente lite, will be allowed as the same appears in the record at the audit of the second and final account.

17. The shares of the common stock of the United Pocahontas Coal Company are not overvalued in the account.

The exceptions filed by Marcellus R. Lare, the sole beneficiary of the above-entitled estate, to the second and final account of the Pittsburgh National Bank (formerly Fidelity Trust Company), administrator pendente lite, are without legal merit and will be dismissed.

A decree dismissing the exceptions filed by Mr. Lare and confirming nisi the second and final account of the bank, as administrator pendente lite, with appropriate schedule of distribution, will be entered in accordance with this opinion.